EDNA R. HANNIBALL, petitioner,

*v.*

HERMAN L. HANNIBALL, defendant.

[Decided December 28th, 1939.]

*Messrs. Wall, Haight, Carey & Hartpence (Mr. Edward J. O'Mara, of counsel), for the petitioner.*

*Mr. John J. Fallon, for the defendant.*

MATTHEWS, A. M.

This is a suit for divorce *a mensa et thoro* on the ground of extreme cruelty.

Petitioner and defendant have been married approximately twenty-two years and have one surviving child, a daughter, fourteen years old.

According to the testimony in the case, petitioner and defendant lived in reasonable harmony until the year 1933. From then until April 16th, 1938, when the petitioner alleges she was forced to leave the defendant's home in Glen Ridge, New Jersey, the defendant is alleged to have carried on a course of abusive treatment which culminated in a quarrel with accompanying violence by the defendant toward the petitioner which forced her to leave on April 16th, 1938.

The question before the court in this case is largely factual, though the legal questions of sufficiency of cruelty under the statute and the question of condonation have been urged by counsel for the defendant. The acts of cruelty complained of by the petitioner, and concerning which testimony was offered in her behalf by herself and her witnesses, are not, save in

the culminating episode, acts of physical violence, though there is testimony of threats of violence with a revolver made by the defendant against petitioner's mother, the carrying out of which the petitioner says she prevented by restraining the defendant.

There are a series of acts testified to by the petitioner, some of them corroborated by petitioner's daughter, and some by others of her witnesses, which, without reciting the testimony, may be referred to generally as acts of abuse by rage and by filthy name calling of the petitioner and her mother by the defendant, on occasions when it was alleged he was drunk, as well as on occasions when he was not drunk.

Backgrounding a great deal of this abusive rage and name calling, accompanied at times with verbal abuse of the parties' daughter, and throwing about of articles of house furnishings, are the financial dealings of the defendant with the petitioner's mother.

The petitioner's testimony, as well as the defendant's testimony on cross-examination reveals that the defendant was an unappreciative beneficiary on many occasions of his mother-in-law's means.

There were quarrels, testified to by the petitioner, during which the defendant went into rage and threats and name calling, resulting from her telling the defendant that she had made good worthless checks which he gave, and on one of these occasions the testimony revealed that the petitioner gave the defendant her engagement ring which he pawned for $200 to make good the check. This last incident happened in 1937. At the hearing of this cause the testimony showed that only $10 plus some interest had been paid by the defendant towards the redemption of the ring.

Indeed the testimony of the defendant, elicited on cross-examination, corroborated the petitioner's testimony that her mother, who as the evidence of both petitioner and defendant shows, was roundly and vulgarly abused in language and threats in her absence but in the presence of the petitioner, was a large contributor of money not alone to the regular living expenses of this couple, but also during the financial difficulties in which the defendant found himself by reason

of business failures. Roughly these contributions, according to the testimony, approximated $60,000 to $70,000.

Why in the face of such largess the petitioner should have been compelled to listen to the foul names which defendant admitted he, at least on one occasion, used about his mother-in-law, and why the petitioner should have been compelled on at least three occasions to plead with defendant not to carry out his threats to shoot his mother-in-law, can be explained only on the theory that uncontrolled rage and base ingratitude characterized defendant's treatment of his wife and her mother.

The testimony of the fourteen-year-old daughter of this couple as to her father's conduct toward her mother appeared worthy of credence. Her testimony about her father's awakening her late at night in April, 1937, and of the events following that incident, are such as to indicate that neither she nor her mother was safe from the uncontrolled rage of the defendant.

Moreover, the daughter's recitation of the incidents of the culminating quarrel of April 16th, 1938, leaves the inescapable conclusion that her father had no respect for either her or her mother.

Over against this testimony of the petitioner and her witnesses there was the testimony of the defendant who denied the drunkenness alleged and testified about against him, and also most of the other acts of which he was accused.

The cross-examination of the defendant, however, forced admissions, and in many instances palpable avoidances of admissions on his part, which may well be considered corroboration of the petitioner's charges and testimony against him. Indeed from my observation of the defendant during the trial, and particularly during his testimony on the stand, I am satisfied that he blinked the truth on occasions and that his attitude as a witness was consistent with the attitude complained of by his wife in her petition and testimony.

His witnesses offered little corroboration of his denial of the charges made by his wife against him.

His witness, Mr. Vogt, left the impression with me, after giving his testimony the attention due a member of the bar,

that he, Mr. Vogt, who insisted that his role in the negotia-
tions preceding this divorce case was that of friend rather
than lawyer, was, at the time of the said negotiations, more
interested in not having the defendant give up any rights he
might have in the property that might accrue to his wife than
in the complaints of the wife against her husband. Mr. Vogt
did testify, however, that the petitioner's mother had con-
sulted him a year before the separation of the couple about
her daughter's threat to leave the defendant then on account
of defendant's treatment of petitioner.

The medical testimony introduced by the defendant to con-
trovert the testimony of the petitioner, as to her physical
condition, which was corroborated in part by her witness,
Dr. Jenkin, had little probative value, due to the fact that
neither of the defendant's medical witnesses had seen the
petitioner professionally in recent years.

Indeed if the heart ailment, which Dr. Cosgrove did not
call organic, and which occurred after childbirth in 1924,
if that ailment, or a predisposition to a recurrence of it, were
known to this defendant, then indeed his conduct testified to
by the petitioner's witness might be considered as heightened
in cruelty in the face of such knowledge.

I find from the proofs in the case that the petitioner has
made out a case of extreme cruelty and that her allegations
have been sufficiently corroborated both by her witnesses and
by the exhibits which she offered at the trial. The daughter's
testimony particularly had all the earmarks of intelligence
and understanding and was entirely worthy of credence.

Counsel for the defendant urges in his brief that sexual
indulgence between the parties up to a few weeks before the
final incident which the petitioner complains of must be
regarded as having condoned all acts prior thereto, and that
the alleged happenings subsequent to such intercourse are
insufficient to warrant the court in granting a decree to the
petitioner.

Moreover, counsel for the defendant makes point of the fact
that petitioner's testimony with respect to this sexual indul-
gence was that she "submitted" to it.

In dealing with this matter of condonation by indulgence

in sexual intercourse the court must, it seems to me, consider the facts of each case in their entirety, as well as the parties and their social status in so far as these reveal themselves in the trial of the cause.

It is difficult indeed to understand how so intimate a relation would be unaccompanied by at least human affection between the parties indulging in it. However, the frequent occurrence of such indulgence in cases that have histories of antecedent cruelties leads me to the conclusion that "submission" may well be an explanation particularly in cases like the one *sub judice.*

That a lull in the storm of connubial infelicity is accompanied by a mere emotional consent to what is ordinarily a concomitant of marital felicity, or that such lull appears so great a relief from a course of cruel treatment that "submission" appears to be a means to the continuance of such relief, should not, it seems to me, stamp such emotional consent or such "submission" as condonation in every case and under all circumstances.

Moreover, our decisions are uniform in holding that condonation of matrimonial offenses is conditioned upon the reformation of the offending spouse.

I find from all of the evidence in this case as well as from my observance of the parties on the witness stand that there was no legal condonation of the cruelties alleged prior to the last act of sexual intercourse, and that the acts subsequent to said intercourse taken in conjunction with the course of treatment of the petitioner by the defendant, as testified to by her witnesses, prior to that intercourse and over a period of some five years, warrant the granting of the relief sought by the petitioner.

I will advise a decree of divorce *a mensa et thoro.*